IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-00878-REB-KLM

DOUGLAS JAMES ALWARD,

      Plaintiff,

v.

KEVIN MILYARD,
RAYMOND HIGGINS,
CHRISTOPHER FLECKENSTEIN,
CHRISTOPHER GASSAWAY,
PATRICK WHITE,
JOHN WALRAVEN,
JEFFERY ERPS, and
JOHN CHAPDELAIN,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendants' **Motion to Dismiss** [Docket No. 14; Filed June 11, 2012] (the "Motion").  Pursuant to 28 U.S.C. § 636(b)(1) and D.C.Colo.LCivR 72.1C.3., the Motion has been referred to this Court for recommendation [#15].  On June 22, 2012, Plaintiff filed a Response in opposition to the Motion [#16].  Defendants did not file a Reply.  The Court has reviewed the Motion, the Response, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion [#14] be **GRANTED in part and DENIED in part**.

## I.  Summary of the Case

1

Plaintiff is a prisoner of the Colorado Department of Corrections ("CDOC") who is incarcerated at the Sterling Correctional Facility ("SCF") in northeastern Colorado.[1]  *See Am. Compl.* [#12] at 5.  Plaintiff escaped from SCF on the evening of August 22, 2010.  *Id.* He surrendered peacefully to CDOC guards and law enforcement from a private residence located on County Road B near Yuma, Colorado on August 25, 2010.  *Id.*  Plaintiff was ordered to lay face down on the grass and keep his hands visible and away from his body. *Id.*  Plaintiff complied with this and all other orders given to him.  *Id.*  While he was on the ground, Defendants Raymond Higgins ("Higgins") and Christopher Fleckenstein ("Fleckenstein") took control of Plaintiff's hands by using standard metal handcuffs to secure them  behind his back.  *Id.*  Defendants John Walraven ("Walraven") and Jeffrey Erps ("Erps") removed Plaintiff's shoes and socks and placed plastic flex cuffs around his ankles.[2]  *Id.*

Still laying face down, Plaintiff was pat searched by Defendants Higgins and Fleckenstein.  *Id.*  Plaintiff was then rolled onto his back and pat searched a second time by Defendants Higgins and Fleckenstein.  *Id.*  Defendant Fleckenstein turned out Plaintiff's pockets, took his eye glasses, and removed his belt and watch.  *Id.*  While on his back, Plaintiff's shirt and undershirt were pulled up around his neck and shoulders by Defendant Higgins.  *Id.*  Defendant Walraven pulled Plaintiff's pants and underpants down around his ankles.  *Id.*  Laying on his back, naked from his shoulders to below his knees, Plaintiff was

---

[1]  In ruling on a motion to dismiss, the Court construes the facts alleged in the light most favorable to Plaintiff.  *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[2]  Plaintiff states that plastic flex cuffs are intended to be used as wrist restraints and make walking on one's own nearly impossible.  *See Am. Compl.* [#12] at 5.

searched for weapons and contraband.  *Id.*  Defendants Higgins and Walraven rolled Plaintiff onto his stomach and someone spread the cheeks of his buttocks to look for weapons and contraband.  *Id.*  Nothing was found in any of the searches.  *Id.*

Plaintiff's clothing was arranged back in place, and he was pulled to his feet and directed toward a CDOC prisoner transport van parked on County Road B approximately 130 feet away.  *Id.* at 6.  Plaintiff moved at a pace of around 1.5 feet per second because the flex cuffs were so tight that they abraded the skin on his legs with each movement.  *Id.*  Plaintiff shuffled approximately 70 feet from the place of his surrender and was stopped twice for photographs.  *Id.*  The second time Plaintiff stopped, Defendant Kevin Milyard ("Milyard") spent at least two minutes verbally abusing him in a belligerent and physically intimidating manner, calling Plaintiff a "shit head" and a "piece of shit." *Id.* at 6, 9. Defendant Milyard then ordered Defendants Higgins and Fleckenstein to drag Plaintiff to the van and strip him.  *Id.* at 6.  Approximately 50-100 men and women civilians were on the nearby road and shoulders, watching.  *Id.*  Defendants Higgins and Fleckenstein dragged Plaintiff through the groups of people and across the road to the rear of the van. *Id.*  Plaintiff asserts that with absolutely no effort to conceal what they were doing, Defendants Higgins and Fleckenstein held Plaintiff in place while Defendants Erps and Walraven cut and tore all of Plaintiff's clothing from his body.  *Id.*  Plaintiff contends that he was stripped so violently that Defendants Higgins and Fleckenstein had to prevent him from being yanked off his feet.  *Id.*

Plaintiff states that initially he was facing north and the rear of the van while Defendants  Walraven and Erps cut and tore Plaintiff's clothing from the back of his body.  *Id.*  Plaintiff avers that Defendants Higgins and Fleckenstein then turned him 180 degrees

3

so that he was facing south while Defendants Walraven and Erps tore the front of his clothing. *Id.* While facing south Plaintiff asserts that he could see approximately 20 people and at least four vehicles at the intersection 50 yards to the south. *Id.* Plaintiff contends that Defendants made no attempt to conceal his naked body from the public. *Id.* Plaintiff states that he had a distinct feeling he was being put on display. *Id.* Plaintiff also contends that Defendants knew first hand that he had already been pat and strip searched and that there was no legitimate reason for stripping Plaintiff on a public road. *Id.* at 9.

Plaintiff was loaded into the van without clothing and driven back to SCF with Defendant Gassaway to his right and Defendant White behind him. *Id.* at 7. Plaintiff was driven into SCF's sallyport where he was observed by the sallyport and perimeter guards. *Id.* Plaintiff avers that instead of being taken directly to his holding cell, Plaintiff was walked through a door to an administrative hall and witnessed by at least twenty people in uniforms and civilian clothes. *Id.* Plaintiff once again states that he felt like he was being put on display. *Id.* Defendants Gassaway and White made no attempt to shield Plaintiff's naked body. *Id.* Plaintiff contends that Defendant Chapdelain was the ranking guard in SCF Intake/ Receiving area and, at the very least, permitted this "spectacle" to occur. *Id.*

Plaintiff avers that at no time did Defendants make any attempt to conceal his naked body or provide him with a way of shielding himself. *Id.* at 8. Plaintiff states that Defendants Gassaway and White held him during the trip to his cell in a way so that the most people had the best opportunity to view his naked body. *Id.* Plaintiff states that he was left completely naked for at least forty minutes. *Id.* at 9. Plaintiff avers that being viewed naked by so many spectators for so long was not incidental to some legitimate procedure. *Id.* During his escape Plaintiff was never accused of pointing a weapon at any

4

person or harming any person, and Plaintiff avers that his escape from SCF was without force. *Id.*

Plaintiff states that the strip search carried out by Defendants on August 25, 2010 was abusive and the ordeal was meant to humiliate, degrade, and dehumanize him. *Id.* Plaintiff asserts that strip searching him in the middle of a public road violated his Fourth Amendment rights as he had previously been pat-and-strip searched in the back yard where he surrendered peacefully. *See Response* [#16] at 2. Plaintiff also contends that his Eighth Amendment rights were violated by the cruel and unusual punishment of stripping him in public and parading him around naked in front of many spectators. *Id.* at 3.

Defendants, who are all sued in their individual capacities only, move to dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6). *See Motion* [#14] at 1. Defendants assert that Plaintiff fails to allege personal participation with regard to Defendant Chapdelain. *Id.* at 5. Defendants contend that they are protected pursuant to qualified immunity. *Id.* at 13. They argue that Plaintiff fails to state a Fourth Amendment claim because his strip search was necessary and within procedure. *Id.* at 8. Finally, they aver that Plaintiff's claim of an abusive strip search does not rise to an Eighth Amendment violation. *Id.* at 6.

## II. Standard of Review

Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to

support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[ ] [has] not nudged [his] claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). That said, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests;" the 12(b)(6) standard does not "require that the complaint include all facts necessary to carry the plaintiff's burden." *Khalik*, 671 F.3d at 1192 .

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Id.* (citation omitted). As the Tenth Circuit has explained, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

6

possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citation omitted).

Finally, the Court must construe the filings of a *pro se* litigant liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Court should not be the *pro se* litigant's advocate, nor should the Court "supply additional factual allegations to round out [the *pro se* litigant's] complaint or construct a legal theory on [his or her] behalf."  *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110).  In addition, a *pro se* litigant must follow the same procedural rules that govern other litigants.  *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

## III. Analysis

All Defendants raise the defense of qualified immunity on both Plaintiff's Fourth Amendment and Eighth Amendment claims.  When this defense is raised in a Rule 12(b)(6) motion to dismiss, the Court employs a two-step process.  One part of the inquiry relates to whether the facts taken in the light most favorable to the plaintiff sufficiently allege a constitutional violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Id.*  However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  *Id.*; *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that although the qualified immunity determination involves a two-part inquiry, if the plaintiff fails either inquiry reviewed in any order, no further analysis need be undertaken and qualified immunity is appropriate).  The Supreme Court has stated that

"[f]or executive officials in general . . . our cases make plain that qualified immunity represents the norm." *Id.* at 807.   Thus, a government official is entitled to qualified immunity in "[a]ll but the most exceptional cases." *Harris v. Bd. of Educ. of the City of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997).

## A.   Fourth Amendment

### 1.   Whether There Is a Properly Alleged Fourth Amendment Violation

The Tenth Circuit requires a nuanced, fact-intensive inquiry regarding whether a strip search is reasonable under the Fourth Amendment. *See Archuleta v. Wagner*, 523 F.3d 1278, 1283, 1286 n.5 (10th Cir. 2008).   The Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).   "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.   "There can be no doubt that a strip search is an invasion of personal rights of the first magnitude." *Archuleta*, 523 F.3d at 1283 (quoting *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993)).[3]   If the Court finds that no legally sufficient justification for the search existed based on the allegations in the complaint, the plaintiff has properly alleged a claim for

---

[3] *Archuleta* and *Bell* both involved pretrial detainees, *i.e.*, persons charged but not yet tried. *Archuleta*, 523 F.3d at 1283 n.2.   The *Archuleta* court specifically declined to comment on strip searches of detainees made after booking. *Id.*   In the present matter, although Plaintiff was a convicted prisoner prior to his escape, the circumstances of his detainment after his escape are analogous to those in *Archuleta* and *Bell*.   Plaintiff had been roaming in public on his own for three days before he was captured and could have obtained, unobserved, a weapon during that period. Similarly, the plaintiffs in *Archuleta* and *Bell* could have had weapons on their persons during their initial arrest because they had been in public and not under the constant supervision of detainment officials.   The Court therefore analyzes Plaintiff's Fourth Amendment claim as if he were a pretrial detainee.

unreasonable search under the Fourth Amendment and the other elements need not be examined. *Archuleta*, 523 F.3d at 1284.

The Tenth Circuit has articulated two primary points for the Court to examine in determining the justification for a strip search of a pretrial detainee. *Id.* First, the Court asks whether the detainee is to be placed in the general prison population. Second, the Court asks whether there is a reasonable suspicion that the detainee has concealed weapons, drugs, or contraband. *Id.* (citing *Warner v. Grand County*, 57 F.3d 962, 964 (10th Cir. 1995); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984)). "Courts have consistently recognized a distinction between detainees awaiting bail and those entering the jail population when evaluating the necessity of a strip search under constitutional standards." *Cottrell v. Kaysville City, Utah*, 994 F.2d 730, 734-35 (10th Cir. 1993). In this case, Plaintiff alleges that after the strip search he was transported to SCF's sallyport, then to SCF's intake/receiving, then through a hallway in the administrative offices area, and then to a holding cell. *Am. Compl.* [#12] at 7. The obvious security concerns inherent in a situation where a recently-escaped detainee is being returned to the general prison population are apparent here, and this element militates against the unreasonableness of the strip search. *See Archuleta*, 523 F.3d at 1284. The Court now turns to whether Defendants may have had a reasonable suspicion that Plaintiff had concealed weapons, drugs, or contraband on his person.

### a.    Defendants Higgins, Fleckenstein, Walraven, and Erps

In this case, Plaintiff alleges that he was strip searched twice. *See Am. Compl.* [#12] at 5, 9. During the first search, Plaintiff was ordered to lay face down on the grass and keep his hands visible and away from his body. *Id.* While he was on the ground,

Defendants Higgins and Fleckenstein took control of Plaintiff's hands using standard metal handcuffs to secure them  behind his back.  *Id.*  Defendants Walraven and Erps removed Plaintiff's shoes and socks and placed plastic flex cuffs around his ankles.  *Id.*  Plaintiff was then pat searched by Defendants Higgins and Fleckenstein.  *Id.*  Plaintiff was rolled onto his back and pat searched again by Defendants Higgins and Fleckenstein.  *Id.*  Defendant Fleckenstein turned out Plaintiff's pockets, took his eye glasses, and removed his belt and watch.  *Id.*  While on his back, Plaintiff's shirt and undershirt were pulled up around his neck and shoulders by Defendant Higgins.  *Id.*  Defendant Walraven pulled Plaintiff's pants and underpants down around his ankles.  *Id.*  Laying on his back, naked from his shoulders to below his knees, Plaintiff was searched for weapons and contraband.  *Id.*  Defendants Higgins and Walraven rolled Plaintiff onto his stomach and someone spread the cheeks of his buttocks to look for weapons and contraband.  *Id.*  Nothing was found in any of the searches.  *Id.*  Defendants then arranged Plaintiff's clothing back in place and pulled him to his feet.  *Id.* at 6.

Plaintiff does *not* assert that the first strip search violated his Fourth Amendment rights.  *See Response* [#16] at 2.  However, Plaintiff asserts that the second strip search did violate his rights.  *Id.*  Defendant Milyard ordered Defendants Higgins and Fleckenstein to drag Plaintiff to the van and strip him.  *Am. Compl.* [#12] at 6.  According to Plaintiff, between 50 and 100 people were standing on the nearby road and shoulders watching the events unfold.  *Id.*  Defendants Higgins and Fleckenstein dragged Plaintiff across the road to the outside rear of the van.  *Id.*  Plaintiff asserts that with no effort to conceal what they were doing, Defendants Higgins and Fleckenstein held Plaintiff in place while Defendants Erps and Walraven cut and tore Plaintiff's clothing from his body.  *Id.*  Plaintiff contends that

he was stripped so violently that Defendants Higgins and Fleckenstein had to prevent him from being yanked off his feet. *Id.* Plaintiff asserts that Defendants made no attempt to conceal his naked body from the public. *Id.* Plaintiff also contends that Defendants knew first hand that he had already been pat and strip searched and that there was no legitimate reason for stripping Plaintiff on a public road. *Id.* at 9.

Under these circumstances, Defendants could not have had a reasonable suspicion that Plaintiff had a weapon or other contraband on his person during the second strip search. "Reasonable suspicion for a search is a minimum level of objective justification 'based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *Id.* (quoting *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007)). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Rice*, 483 F.3d at 1083.

Based on the allegations, Plaintiff was strip searched and fully examined a second time within a matter of minutes after the same four individuals had conducted the first strip search. These individuals therefore knew that a thorough strip search of Plaintiff had already been conducted. The Court therefore finds that these allegations demonstrate that a second, public strip search was not supported by reasonable suspicion.

Tenth Circuit case law is in accord with this finding. In *Archuleta*, the court found that a booking officer unreasonably strip searched a detainee when he knew that she would have been frisked during her arrest as well as in the waiting area prior to booking. *Archuleta*, 523 F.3d at 1284 n.3. In *Foote v. Spiegel*, 118 F.3d 1416, 1425, (10th Cir. 1997),

the court found that officers could not have had a reasonable suspicion that a detainee had contraband so as to justify a strip search after a previous pat down through light summer clothing failed to reveal any prohibited items.

Plaintiff asserts that Defendants Higgins, Fleckenstein, Walraven, and Erps participated in the first strip search.  He asserts that these four Defendants also conducted the second strip search.  Based on these allegations, the Court finds that Plaintiff has properly alleged that these four Defendants could not have had a reasonable suspicion that Plaintiff had a weapon or contraband under these circumstances.  Plaintiff has thus satisfied the first step of the two-step qualified immunity inquiry by demonstrating that his Fourth Amendment constitutional rights were violated by Defendants Higgins, Fleckenstein, Walraven, and Erps.

### b.   Defendant Milyard

Plaintiff alleges that Defendant Milyard was present during his arrest and ordered the second strip search after verbally harassing him for at least two minutes.  Plaintiff does not allege that Defendant Milyard took part in the actual strip search itself.

"Individual liability under [42 U.S.C.] § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote*, 118 F.3d at 1423 (citing *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996)); *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) ("Personal participation is an essential allegation in a Section 1983 claim." (citations omitted)).  A defendant is personally involved in an alleged constitutional violation only if there is an "affirmative link" between his conduct and the described violation. *Stidham v. Peace Officer Stds. & Training*, 265 F.3d 1144, 1156 (10th Cir. 2001).  Because of the "affirmative link" requirement, a defendant in a position of general supervisory authority

12

cannot be held vicariously liable for constitutional violations committed by his subordinates. *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) ("Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights."); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) ("[S]upervisor status by itself is insufficient to support liability." (citing *Rizzo v. Goode*, 423 U.S. 362, 376 (1976))); *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir. 1991) ("'[T]here is no concept of strict supervisor liability under section 1983.'" (citation omitted)).

Because the allegations are clear that Defendant Milyard did not personally participate in the removal of Plaintiff's clothes, the Court assumes that Plaintiff's theory of liability with regard to Defendant Milyard rests on his role as the superior officer of Defendants Higgins, Fleckenstein, Walraven, and Erps.  Courts have explained that a defendant in a supervisory position may be personally involved in an alleged constitutional violation committed by his subordinates in two situations.  First, supervisor liability may arise when the supervisor was personally involved in directing the subordinates to take the action that resulted in the alleged constitutional violation.  *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992).  Second, supervisor liability may arise when the supervisor had actual knowledge that the subordinates were committing the alleged constitutional violation and acquiesced in its commission.  *Id.* (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3rd Cir. 1990) (stating that supervisor liability requires "allegations of personal direction or of actual knowledge and acquiescence")).  However, the simple fact that a supervisor knew of and acquiesced in a constitutional violation committed by the subordinates may no longer establish that he or she was personally involved in the violation.  *See Arocho v. Nafziger*, 367 Fed. App'x 942, 947 n.4 (10th Cir.

2010) (citing *Iqbal*, 556 U.S. at 677).

Plaintiff's allegations demonstrate that Defendant Milyard was personally involved by directing his subordinates to take the action that resulted in the alleged violation of Plaintiff's Fourth Amendment rights. *See Woodward*, 977 F.2d at 1400. Accordingly, the Court finds that Plaintiff has alleged sufficient facts to establish a basis for imposing supervisory liability against Defendant Milyard for any unreasonable search.

### c.      Defendants Gassaway, White, and Chapdelain

Plaintiff's allegations regarding the search, however, do not establish a legal basis for imposing liability on Defendants Gassaway, White, and Chapdelain for a violation of Plaintiff's Fourth Amendment rights. As discussed, an individual's liability under § 1983 must be based on either personal involvement in the unconstitutional conduct or supervisory liability for an actor's conduct. *See Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). Plaintiff does not allege that Defendant Chapdelain was at the scene of his arrest where the strip searches occurred. Further, he does not allege that Defendants Gassaway and White participated in the strip search at all. Plaintiff alleges no facts concerning those two individuals until after the strip search occurred and he was placed in the van for transport back to SCF. Thus, the Complaint is clear that these three Defendants did not personally participate in the removal of Plaintiff's clothes and the search of his person. The Court finds that any alleged involvement after the second strip search, such as escorting Plaintiff from the van and around the prison facility, fails to demonstrate a Fourth Amendment unreasonable search claim.[4]   In addition, Plaintiff has not

---

[4]  There is a dearth of case law on the issue of when a search pursuant to the Fourth Amendment ends. Defendants Gassaway and White were presented with Plaintiff, still allegedly

demonstrated that any of these three individuals had any connection to his second strip search in any kind of a supervisory capacity.

Accordingly, the Court finds that Plaintiff has failed to state facts that would establish a basis for imposing liability against Defendants Gassaway, White, and Chapdelain for any unreasonable search.

### 2.    Whether the Fourth Amendment Right was Clearly Established

The Court next turns to the second step of the qualified immunity analysis, *i.e.*, whether those rights were clearly established at the time of the search.   Courts must determine whether the constitutional right was clearly established in "the context of the particular case before the court, not as a general, abstract matter." *Simkins v. Bruce*, 406 F.3d 1239, 1241 (10th Cir. 2005).   That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer [in each defendant's position] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

___

naked, after Plaintiff had been stripped and searched by Defendants Milyard, Higgins, Fleckenstein, Walraven, and Erps.  Defendants Gassaway and White did not remedy the alleged wrong allegedly instigated and conducted by the other five Defendants by providing a covering of some kind for Plaintiff.  However, Plaintiff does not allege that Defendants Gassaway and White were present or participated in any manner in the second strip search.  Fourth Amendment liability on these facts would create a slippery slope for prison officials.  For example, if a prisoner is strip searched in one room and then handed over to a different set of guards to walk him to a holding cell, are the second set of guards liable for the original search if the prisoner remains unclothed?  If a prisoner is strip searched in one room and left in that room naked, do other guards at the facility who did not participate in the strip search become liable for the search because they were outside of the room and failed to provide the prisoner with clothing?  Regardless, even were the Court to find that Plaintiff's Fourth Amendment claim against Defendants Gassaway, White, or even Defendant Chapdelain has viability, the dearth of case law on this subject indicates that Plaintiff's Fourth Amendment right as to these three Defendants would not pass the second step of the qualified immunity test, *i.e.*, that this right was clearly established by on-point Supreme Court or Tenth Circuit case law.  *See infra* § III.A.2.  Defendants Gassaway, White, and Chapdelain would therefore be entitled to qualified immunity regardless of the outcome of the first step of this analysis.

Further, in order for a constitutional right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clear weight of authority from other circuits must establish the constitutional right. *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). In other words, there must be case authority in which a constitutional violation was found based on similar conduct. *See Callahan v. Millard Cnty.*, 494 F.3d 891, 903 (10th Cir. 2007).

The events underlying this lawsuit occurred on August 25, 2010. *See Am. Compl.* [#12] at 5. On April 8, 2008, it was clearly established by the *Archuleta* court that an official must possess a reasonable suspicion that the pretrial detainee possesses or may possess a weapon before a legal strip search may be made. *See Archuleta*, 523 F.3d at 1286.[5] As indicated above, Plaintiff has successfully pled that Defendants Milyard, Higgins, Fleckenstein, Walraven, and Erps had no reasonable suspicion when they strip searched Plaintiff the second time. Thus, the Court finds that these five Defendants are not entitled to qualified immunity on these facts.

Accordingly, the Court **recommends** that Defendants' Motion be **granted in part** and that Plaintiff's Fourth Amendment unreasonable search claim be **dismissed** as to Defendants Gassaway, White, and Chapdelain. The Court further **recommends** that Defendants' Motion be **denied** as to Plaintiff's Fourth Amendment unreasonable search claim against Defendants Milyard, Higgins, Fleckenstein, Walraven, and Erps.

**B.    Eighth Amendment**

---

[5]    The Tenth Circuit noted that this requirement had been established even before it reaffirmed its prior holdings. *Archuleta*, 523 F.3d at 1286-87 (citing *Foote*, 118 F.3d at 1425; *Cottrell*, 994 F.2d at 734-35; *Hill*, 735 F.2d at 394).

Defendants further contend that they are entitled to qualified immunity on Plaintiff's Eighth Amendment claim of cruel and unusual punishment.[6]

### 1.     Whether There Is a Properly Alleged Eighth Amendment Violation

The Eighth Amendment prohibits not only "barbarous physical punishment" but also "the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153 (1976)). The Constitution prohibits punishment that is "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg*, 428 U.S. at 183. "The gratuitous infliction of pain always violates contemporary standards of decency and need not produce serious injury in order to violate the Eighth Amendment." *Quade v. Milyard*, No. 07-cv-00229-WYD-MJW, 2008 WL 4097468, at *2-3 (D. Colo. Sept. 2, 2008) (citing *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992)).[7] Further, the Eighth Amendment also prohibits the wanton infliction of psychological pain. *See Calhoun v. DeTella*, 319 F.3d 936, (7th Cir. 2003) (citing cases); *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001) ("[W]e are in accord with Justice Blackmun's views in *Hudson v. McMillian*, 503 U.S. 1, 16-17 (1992) that the Eighth

---

[6]   Plaintiff does not make any reference to Defendant Chapdelain in connection with his Eighth Amendment claim. *See Am. Compl.* [#12] at 8-9. The Court therefore finds that Plaintiff only makes his Eighth Amendment claim against the other seven Defendants.

[7]   The Court largely adopts the analysis provided in *Quade*, which similarly dealt with a non-physically abusive public strip search of an incarcerated prisoner in the context of an Eighth Amendment claim of cruel and unusual punishment. In *Quade*, the prisoner plaintiff alleged that the defendants "perform[ed] a body cavity search in front of dozens of officers and over 500 inmates while being recorded by security cameras;" that the plaintiff and the other prisoners were forced to "sit down and face forward in rows . . . where they had to observe the cavity searches;" that after the searches were completed, the plaintiff was ordered to "walk completely naked out into the middle of the gym to retrieve [his] clothing, in front of the eyes of all present;" and that the searches were maliciously conducted for the express purpose of punishment and humiliation. *Quade*, 2008 WL 4097469, at *3.

Amendment may be implicated not only [by] physical injury, but also by the infliction of psychological harm.").

In this case, Plaintiff alleges physical abuse by the wrist restraints tightly placed on his ankles and by the violent "cutting and ripping" of the clothes from his body.  He also alleges that the strip search was motivated by a punitive intent because Defendant Milyard had spent at least two minutes verbally abusing him, calling Plaintiff a "shit head" and a "piece of shit" immediately before ordering Defendants Higgins and Fleckenstein to drag Plaintiff to the van and strip him.  Even aside from these allegations, however, the Court finds that the allegations in the Amended Complaint, construed in the light most favorable to Plaintiff, could support a claim that the strip search was conducted in an abusive fashion. *See Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986) (dismissing an Eighth Amendment claim for a body cavity search when the plaintiff did not allege that the search "was conducted in an abusive fashion").

Plaintiff has alleged that the search was conducted in a public manner on Defendant Milyard's order.  He specifically alleges that he was strip searched in front of 50 to 100 people by Defendants Higgins, Fleckenstein, Walraven, and Erps after he had already been strip searched once; the front of his body was turned directly toward at least 20 people and four vehicles; he was taken to the rear of the van and made to stand out in the open; and no efforts were made to conceal his body. *Am. Compl.* [#14] at 6-7.  Plaintiff further alleges that when he arrived at SCF, still naked, he was observed by at least 20 people, both male and female, some of whom were in civilian clothes; that he was taken into a hallway with administrative offices by Defendants Gassaway and White and made to stand there for at least 30 seconds with numerous people around; and that again no effort was made to

18

shield any part of his body from view. *Id.* at 7-9.  The Court notes that other courts have held that a strip search violates the Eighth Amendment where the search was "conducted in a harassing manner intended to humiliate and inflict psychological pain."  *Quade*, 2008 WL 4097469, at *3 (citing *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *see also Vasequez v. Raemisch*; 480 F.Supp.2d 1120, 1131-32 (W .D. Wis. 2007)).   After carefully reviewing Plaintiff's allegations, the Court finds that it is plausible at this stage of the litigation that the search was conducted in an abusive manner.

While Defendants may have had a legitimate penological purpose for the initial search itself, the Court finds that no legitimate purpose has been stated for the second search conducted in the presence of many civilian witnesses of both sexes, or for parading an allegedly naked Plaintiff around administrative offices at SCF.  Thus, viewing the evidence in the light most favorable to Plaintiff, the Court finds that the manner of the search could be viewed as having been conducted in a harassing manner intended to humiliate and inflict psychological pain and that Plaintiff has stated an Eighth Amendment claim for cruel and unusual punishment.  *See Quade*, 2008 WL 4097469, at *3 (citing *Payette v. Hoenisch*, No. 07-3249, 2008 WL 2648917, at *5 (7th Cir. 2008) (Payette's evidence "that he was strip searched in front of a window in which everyone in the booking department, including inmates and officials of both sexes, could see him . . . create a triable dispute whether the search was conducted 'in a harassing manner intended to humiliate and inflict psychological pain'") (quoting *Calhoun*, 319 F.3d at 939); *Solan v. Ranck*, No. CV-06-0049, 2007 WL 4111424, at *8 (M.D. Pa. 2007) (holding that an Eighth Amendment claim was stated where plaintiff alleged that correctional officers deliberately prevented him

from placing his towel around his waist then dragged him naked in front of a large group of people of both sexes; this allegation supports the inference that they intended to humiliate him, an action without any penological justification, due to the fact that defendants deliberately put the plaintiff on display naked); *Vasequez v. Raemisch*; 480 F. Supp. 2d 1120, 1131-32 (W.D. Wis. 2007) (holding that an Eighth Amendment claim was stated regarding a strip search where the plaintiff alleged that several officers made contact with his genitals; the court held that "[e]ven if legitimate security reasons existed for proceeding directly to a manual search, there could be no legitimate purpose for using a strip search as a means of obtaining sexual gratification or conducting it in a manner intended to humiliate the prisoner, which is what petitioner alleges respondents ... were doing")).

### 2.    Whether the Eighth Amendment Right was Clearly Established

Turning to the second step, whether Plaintiff's Eighth Amendment rights were clearly established at the time of the search, the Court finds that they were.  The events underlying this lawsuit occurred on August 25, 2010.  *See Am. Compl.* [#12] at 5.  On May 3, 2002, the Tenth Circuit Court of Appeals noted that "the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related a legitimate penological interest" had been well established at least since May of 1993.  *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002).  Based on the allegations in the Amended Complaint, Plaintiff has stated a claim that Defendants Milyard, Higgins, Fleckenstein, Walraven, and Erps violated a clearly established constitutional right by publicly strip searching Plaintiff the second time.  Defendants Gassaway and White allegedly held Plaintiff throughout his naked trek in SCF, including the time spent in the

administrative offices. *Am. Compl.* [#12] at 8. Accordingly, the Court finds that these seven Defendants are not entitled to qualified immunity on these facts.

## IV. Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that the Motion [#14] be **GRANTED in part and DENIED in part**, as follows:

(1)     Plaintiff's Fourth Amendment claim against Defendants Gassaway, White, and Chapdelain should be **DISMISSED without prejudice**;

(2)     Defendant Chapdelain should be **DISMISSED without prejudice** as a Defendant;

(3)     The Motion should be **DENIED** with respect to the remainder of Plaintiff's Fourth Amendment claim against Defendants Milyard, Higgins, Fleckenstein, Walraven, and Erps; and

(4)     The Motion should be **DENIED** with respect to Plaintiff's Eighth Amendment claim against Defendants Milyard, Higgins, Fleckenstein, Walraven, Erps, Gassaway, and White.

IT IS **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P.  72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91

F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  October 1, 2012

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge